[No. 25933. *En Banc.* November 14, 1935.]

THE STATE OF WASHINGTON, *on the Relation of Washington Navigation Company, Appellant,* v. PIERCE COUNTY *et al., Respondents.*[1]

[1]Reported in 51 P. (2d) 407.

*Charles T. Peterson,* for appellant.

*Harry H. Johnston* and *John E. Belcher,* for respondents.

HOLCOMB, J.—This is an action in mandamus by appellant against Pierce county and its county commissioners, county auditor, and county treasurer, to compel them to audit, approve for payment and issue a warrant to it in the sum of seven thousand dollars, alleged to be due appellant as subsidies for the opera-

tion by appellant of a ferry in Pierce county during the months of June and July, 1935. It claims the right thereto by virtue of contracts made at various times with the then boards of county commissioners, covering a period of ten years.

An alternative writ was granted by the lower court, upon the return date of which respondents answered, denying that any sum whatever was due and owing appellant, because the contracts made the basis of the action were and are *ultra vires;* and by cross-complaint, in two separate causes of action, demanded recovery from appellant in the sum of $303,600; the first cause of action being for $299,000 theretofore paid appellant, covering a period of nine years, and the second cause of action was for license fees aggregating $3,600.

By answer to the cross-complaint, relator set up two special pleas, first, the three year statute of limitations, and second, an estoppel.

After a trial to the court on the merits, the trial court denied the writ, allowed recovery on respondents' first cause of action against appellant for the years within the three year statute of limitations, but denied recovery on the second cause of action. Before the entry of judgment, this written stipulation was made by the parties:

"It is hereby stipulated by and between the parties hereto through their respective counsel that the amount of subsidies paid to the Washington Navigation Company by Pierce county for the three year period ending May 31st, 1935, was the sum of $126,000, made up as follows:

"1932 June 1st to Dec. 31st $24,500
1933 Jan. 1st to Dec. 31st 42,000
1934 Jan. 1st to Dec. 31st 42,000
1935 Jan. 1st to May 31st 17,500

$126,000

"This stipulation is entered into because the evidence in said cause fails to show a segregation of the sums so paid during the period involved in said suit. The total sum for the period being pleaded by the county and admitted in the pleadings by the relator without segregation.

"Dated at Tacoma, this 17th day of October, 1935."

Among others, the trial court made the following findings, the third of which is more of a summary and conclusion of law than a finding of fact:

"(1) That the Washington Navigation Company, is and at all of the times hereinafter mentioned was a corporation duly organized and existing under and by virtue of the laws of the state of Washington, and has paid its annual license fee last past due.

"(2) That Pierce county is one of the duly organized counties and political sub-divisions of the state of Washington; that Harvey O. Scofield, John Schlarb and A. A. Rankin are the duly elected, qualified and acting members of the board of county commissioners of Pierce county, Washington, and that S. Clifford Davis is the duly elected, qualified and acting county auditor of Pierce county, Washington, and that Paul Newman is the duly elected, qualified and acting county treasurer of Pierce county, Washington.

"(3) That, at all of the times hereinafter mentioned, and since long prior to statehood, to-wit: since the year 1854, there has been and now is in existence on the statute books of the state of Washington a complete legislative enactment dealing with the matter of ferry operation on the rivers, lakes, and other bodies of water within the state of Washington, by the provision of which exclusive jurisdiction over such ferries is, by the sovereign state, delegated to, and vested in, the boards of county commissioners of the various counties of the state of Washington wherein such ferry systems are maintained and operated for the convenience of the travelling public; such political subdivisions of the sovereign state being further authorized to construct, condemn, or purchase, operate and maintain ferries or boats across, wharf at, any unfordable stream, lake,

estuary, or bay within or bordering on said county, or across any body of water separating any portions of such county or separating such county from other counties, together with all the necessary boats, grounds, roads, approaches and landings necessary or appertaining thereto, with full jurisdiction and authority to operate and maintain the same free or for toll, by and under the direction of the board of county commissioners of such county and as such board shall by resolution determine.

"(4) That in the year 1916, certain residents of the peninsular district of Pierce county, at or near Gig Harbor, petitioned the board of county commissioners of Pierce county to establish ferry service from Tacoma to Gig Harbor, and thereafter and on to-wit: the 24th day of March, 1917, pursuant to the authority in it vested by said ferry law referred to in the preceding paragraph hereof, the then county commissioners of Pierce county purchased a certain ferry named 'City of Vancouver,' which was later, by said county, renamed 'City of Tacoma,' and which said county for a time operated in its proprietory capacity under an arrangement whereby it paid a lawful subsidy to keep said ferry in operation.

"(5) That thereafter and in the month of July, 1926, said county, acting through its then board of county commissioners, sold said ferry, together with another ferry named 'Gig Harbor,' to relator herein for the sum of $64,998.97, and on said date ceased to own or have any proprietory interest whatsoever in said vessels.

"(6) That on the 20th day of July, 1926, one Henry Ball, Frederic Shaw and Forrest R. Easterday, constituting the board of county commissioners of Pierce county, undertook to make a contract in writing with said Mitchell Skansie for a period of ten years from January 1, 1927, providing for the future operation of a ferry system owned, or to be thereafter acquired and owned by the said Skansie, by the terms of which the said Skansie was to receive all receipts, fares and income, less an amount equal to 5% of the gross earnings to be paid to Pierce county, to become effective on and after January 1, 1927, and to continue until January 1,

1937, which purported agreement was transferred by said Skansie to the relator herein, and which agreement was attempted to be modified on the 27th day of May, 1930, by George M. Meath, C. Ostlund, and C. A. Campbell, constituting the then board of county commissioners of Pierce county, by adding additional vessels and making certain changes in the routes and time schedules theretofore adopted, but these respondents allege the fact to be that the resolution then adopted and the agreement made on said 27th day of May, 1930, was but the exercise of those duties devolving upon said board of county commissioners in the regulation of the service and rates of the relator herein vested in said commissioners under the said ferry laws of the state of Washington and not otherwise.

"(7) That on or about the 2nd day of February, 1927, Henry Ball and George Meath, two of the then members of the board of county commissioners of Pierce county, without lawful authority to bind Pierce county, undertook to make an agreement in writing with the Washington Navigation Company, a corporation, for the operation of a ferry boat between Steilacoom and McNeil's Island in Pierce county, and without requiring the payment to Pierce county of a license fee for such franchise right and privilege, undertook to agree to pay to the said Washington Navigation Company a subsidy of $750 per month for a period to end January 1, 1937, in violation of the existing so-called ferry laws of the state of Washington, in full force and effect at said time, which the cross-complaint alleges was in violation of law and beyond the power of said Ball and Meath and not in anywise binding on Pierce county, and was and is of no legal effect and to the detriment of the best interests of Pierce county and the taxpayers thereof.

"(8) That on or about the 27th day of June, 1927, Frederic Shaw, Henry Ball and George Meath, members of the board of county commissioners of Pierce county, without lawful authority to bind Pierce county, undertook to make an agreement in writing with the Washington Navigation Company, a corporation, for the operation of a ferry boat between Sixth avenue (Titlow Beach) and Wollochet, East Cromwell, and

Fox Island, in Pierce county and without requiring the payment to Pierce county of a license fee for such franchise right and privilege undertook to agree to pay to the said Washington Navigation Company a subsidy of $1,150 per month for a period to end January 1, 1937, in violation of the existing so-called ferry laws of the state of Washington, in full force and effect at said time, which this cross-complainant alleges was in violation of law and beyond the power of said Shaw, Ball, and Meath, and not in anywise binding on Pierce county, and was and is of no legal effect and to the detriment of the best interests of Pierce county and the taxpayers thereof.

"(9) That on or about the 3rd day of December, 1929, George M. Meath, C. Ostlund and C. A. Campbell, the then board of county commissioners of Pierce county, without lawful authority to bind Pierce county, undertook to make an agreement in writing with the Washington Navigation Company, a corporation, for the operation of a ferry boat between Sixth Avenue (Titlow Beach) and Point Fosdick, in Pierce county, and without requiring the payment to Pierce county of a license fee for such franchise right and privilege, undertook to agree to pay to the said Washington Navigation Company a subsidy of $1,600 per month for a period of end January 1, 1937, in violation of the existing so called ferry laws of the state of Washington, in full force and effect at said time, which this cross-complainant alleges was in violation of law and beyond the power of said Meath, Ostlund and Campbell and not in anywise binding on Pierce county, and was and is of no legal effect and to the detriment of the best interests of Pierce county and the taxpayers thereof.

"(10) The court further finds that all payments heretofore made to the Washington Navigation Company as so-called subsidies were *ultra vires* and unlawful and in violating Article VIII Sec. 7 of the constitution of the state of Washington and that within the period of the three year statute of limitations there has been unlawfully paid to the relator by the county of Pierce the total sum of One Hundred Twenty-six Thousand Dollars ($126,000) in which

sum the said relator, Washington Navigation Company is indebted to Pierce county, with interest."

The third finding is vigorously assailed by appellant as to the statement by the trial court that

". . . . since the year 1854 there has been and now is in existence, . . . a complete legislative enactment dealing with the matter of ferry operations . . . by the provision of which exclusive jurisdiction is . . . vested in the board of county commissioners."

Having examined all of the sections respecting the matter, we think the trial court was correct in that statement.

In *State ex rel. Allen v. Public Service Commission,* 111 Wash. 294, 190 Pac. 1012, in 1920, we held that the public service act of 1911 did not repeal or supplant the ferry laws, which constituted special legislation and left ferries within the control and jurisdiction of the local authorities. By the laws of 1927, chapter 248, p. 382, Rem. Rev. Stat., § 10361-1 [P. C. § 5552-1], the public service commission law was amended, and, among other things, the following amendment was enacted:

"*Provided,* That nothing herein shall be construed to affect the right of any county within this state to construct, condemn, purchase, operate or maintain, itself or by contract, agreement or lease, with any person, firm or corporation, ferries or boats across or wharfs at or upon the waters within this state, including rivers and lakes and Puget Sound, provided such operation is not over the same route or between the same districts, being served by a certificate carrier, nor shall this act be construed to affect, amend or invalidate any contract entered into prior to January 15, 1927, for the operation of ferries or boats upon the waters within this state, which was entered into in good faith by any county with any person, firm or corporation."

Thus, in enacting this amendment, the legislature clearly delegated authority to two distinct and separate boards having jurisdiction over ferries, each having its own field definitely and distinctly limited; the department of public works having jurisdiction in all cases except as outlined in the above quoted amendment.

Twenty-six errors assigned by appellant are argued under seven points. Our decision as to the law determines almost all points involved.

Appellant strenuously insists that, ever since the decision in *State ex rel. Jackson v. King County,* 29 Wash. 359, 69 Pac. 1106, decided in 1902, this court has followed the rule there laid down that such contracts of counties delegating ferryage powers have been upheld; citing *Anderson Steamboat Co. v. King County,* 84 Wash. 375, 146 Pac. 855; *Bergen v. Lewis County,* 95 Wash. 499, 164 Pac. 73; *Hart v. King County,* 104 Wash. 485, 177 Pac. 344; *Woody v. Port of Seattle,* 118 Wash. 163, 203 Pac. 59; *Raine v. Port of Seattle,* 118 Wash. 168, 203 Pac. 61; *Pierce County v. Washington Navigation Co.,* 175 Wash. 344, 27 P. (2d) 569.

Respondents rely particularly upon Art. VIII, § 7, of the Washington constitution, which, so far as pertinent, reads:

"No county, city, town, or other municipal corporation shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association, company, or corporation, except for the necessary support of the poor and infirm. . . ."

Respondents assert that our decisions in *State ex rel. Potter v. King County,* 45 Wash. 519, 88 Pac. 935, and *Johns v. Wadsworth,* 80 Wash. 352, 141 Pac. 892, are controlling.

We are compelled to agree with respondents that

the constitutional provision above quoted prohibits the making of such contracts as are here in question. As was observed in the *Johns* case, *supra,* another provision of the constitution, Art. I, § 29, reads:

"The provisions of this constitution are mandatory, unless by express words they are declared to be otherwise."

That case involved a law authorizing any county to appropriate money for the support of an agricultural fair association, which had a corporate existence, for the purpose and object of holding a fair and agricultural exhibition, and Pierce county appropriated $3,586.19 in aid of the Fair Association of Western Washington, which was a corporation coming within the terms of the act. We there observed that, although agricultural fairs served a good purpose and would undoubtedly be of great public benefit,

"If the framers of the constitution had intended only to prohibit counties from giving money or loaning credit for other than corporate or public purposes, they would doubtless have said so in direct words."

Ellis, J., felt obliged to concur with the majority, although reluctantly, for the reason that the terms of the quoted provision of the constitution were so clear and explicit as to leave no room for construction.

It must be granted that a public ferry is a part of a highway and necessarily subserves public interest and convenience. Realizing that necessity and public interest, as was said by the trial court, since 1854, ferries have been authorized and regulated by the legislature. In 1895, the license law apparently proving inadequate, the legislature authorized cities, towns and counties to themselves provide ferry service, free or for toll. This legislation was extended in 1899,

1919, 1927, and authorized under the port district act in 1911, Rem. Rev. Stat., § 9692 [P. C. § 4475].

However, its enactments all contemplated the operation of a ferry by the county, city or town or port district, or someone to whom was delegated such right. All of the cases cited by appellant were cases where the municipality concerned delegated those rights to others.

In the *Jackson* case, *supra,* the constitutional provision above quoted was neither cited, mentioned, nor discussed. It was decided solely upon the legislative authority that the legislature, in effect, had authorized counties to lease to private operators a ferry owned by the county. A different decision might have been rendered, had the facts been like those here. What was not presented or discussed in a decision was not decided. *Continental Mutual Savings Bank v. Elliott,* 166 Wash. 283, 6 P. (2d) 638, 81 A. L. R. 1005.

All of the cases following that case merely follow the rule there stated to the effect that, under the laws of 1899, providing that counties were authorized to operate or maintain ferries across any body of water within or bordering on such county, free or for toll, by and under the direction and control of the board of county commissioners of such county, and as such board should by resolution determine, a county not only has power to operate a ferry, but is authorized to maintain one by leasing a ferry owned by it to private individuals. In the *Jackson* case, the board of county commissioners of King county had entered into contract with two persons whereby they agreed to take possession of a certain ferry boat owned by the county, used for carrying passengers and freight, and operate it for a period of three years in consideration of the tolls to be earned by the boat, at rates to be prescribed by the county commissioners and the

further sum of $375 per month to be paid out of the county treasury. It was there said:

"In carrying into effect the contract in question, the county is doing no more than maintaining a ferry, and it is not therefore proceeding in excess of its powers."

This is not the situation here. In the instant case, it will be recalled, respondent county is no longer the owner of the ferry boats, which it sold and transferred, limiting the rates and tolls to be charged by appellant, in 1926.

We agree with appellant that the trial court was misled into stating that the sale of the ferry "Gig Harbor" and the making of the Point Defiance-Gig Harbor contract were involved herein. That contract is not involved in this case. However, we consider the matter unimportant. As a matter of fact, when the county sold its ferry boats in 1926 to the assignor of appellant, it went out of the ferry business completely. The county parted with its title, absolutely. The ferry boats became the property of a private party. The boats were not merely leased to appellant, or its assignor, as was the condition in all of the cases cited by appellant.

True, there are cases in this and other jurisdictions, some of which were cited by appellant, holding as in *State ex rel. Hart v. Clausen,* 113 Wash. 570, 194 Pac. 793, 13 A. L. R. 580, that generally the question is one for the legislature, and when that body has exercised its discretion, it will not be disturbed by the courts. If the purpose for which the taxing power is exercised is a public purpose, a moral obligation on the part of the state to meet that purpose is sufficient to sustain the law. Cf. *State ex rel. State Reclamation Board v. Clausen,* 110 Wash. 525, 188 Pac. 538, 14 A. L. R. 1133. But those cases do not

meet the constitutional prohibition here in question.

Another case relied upon by both parties hereto is *Norton v. Anderson,* 164 Wash. 55, 2 P. (2d) 266, where the liability of King county for damages suffered by an intended passenger was at issue because of defects in the dock, in which we adverted to the *Jackson* case, *supra,* as sustaining the lease by King county involved therein. We also said:

"The county's position is not at all what it would have been had it disposed of the ferries absolutely, retaining no measure of control over their future operation. Under the lease, it still exercised power conferred by the statute, and in doing so it might lawfully assume such duties as it saw fit so long as the duties were necessary to be performed in the exercise of the power."

The same principle applies here. The county did just that thing in the instant case. It disposed of the ferries absolutely, retaining no measure of control over their future operations, except as to its public tolls and its free services to the county, under its contracts.

Our conclusion is that the contracts involved in this suit are forbidden by the constitution heretofore quoted.

That does not end this matter, however. We do not agree with the trial court in disallowing the reasonable value of what the county received during the operation of these contracts as not consisting of fixtures or permanent improvements.

It was pleaded, proven, and uncontradicted by evidence on behalf of respondents, that, during the years 1932, 1933 and 1934, or the years which would not be barred by the statute of limitations, the county received value by transportation of its county trucks, machinery, equipment and employees to the extent of, in 1932, $8,923.20; in 1933, $14,035.05; and in 1934,

$12,058.90, totalling $35,017.15. The 1935 figures were not available, although appellant is still performing the contract and respondent county is availing itself of its benefits.

The stipulation above quoted is that payments were made to May 31, 1935. The cross-complaint of respondents, on which they recovered, was served and filed on August 22, 1935. An action is not commenced, so as to toll the statute of limitations, until the complaint is filed. *Murker v. Northern Pacific R. Co.*, 95 Wash. 280, 163 Pac. 756; *Kope v. Columbia River Interstate Bridge Commission*, 147 Wash. 602, 266 Pac. 1053. In so far as a defendant is concerned, a cross-complaint is the same as an original action. *Northwestern & Pac. Hypotheek Bank v. Ridpath*, 29 Wash. 687, 70 Pac. 139. Hence, the offset allowed by the trial court should in no event have been for payments made prior to August 22, 1932, when the cross-complaint of respondents was served and filed. Those items would total $10,500 in addition to the $35,017.15 above mentioned.

Respondents contend that the reasonable value of the transportation of county property must be considered as in lieu of licenses for the three years. The license fees could not amount to more than nine hundred dollars in any event and, as the trial court observed, might have been much less for any one year. Each year was dependent upon the action of the board of county commissioners with appellant under the ferry license law. The reasonable value of the services rendered the county was so much greater than the maximum license fee that we cannot agree with that theory.

Nor do we agree with appellant that the undisputed evidence must control that the value of the services rendered by appellant to respondent county was not

less than $42,000 each year. That would amount to $126,000 for the three years. The rates charged were placed beyond the control of appellant by contract, but the contracts on its part and the rates charged thereby were certainly voluntarily made by it. We cannot consider that the services can be admeasured in any other way than by those fixed in the contract, even though invalid. (Cf. *Snyder v. Harding,* 38 Wash. 666, 80 Pac. 789, not cited.)

Although the contracts were void under our constitution, this court has always endeavored to hold municipalities to the same standard of right and wrong that the law imposes upon any individual. *Green v. Okanogan County,* 60 Wash. 309, 111 Pac. 226, 114 Pac. 457; *Franklin County v. Carstens,* 68 Wash. 176, 122 Pac. 999; *Mallory v. Olympia,* 83 Wash. 499, 145 Pac. 627; and *Abrams v. Seattle,* 173 Wash. 495, 23 P. (2d) 869.

Appellant has spent a vast sum of money, more than $225,000, in additions and improving and enlarging these ferry boats to enable it to handle the business under its contracts with respondent county. Respondents have accepted the benefits of those services for all those years, although under what must be held to be invalid contracts. But, as was said in some of our above cited cases, justice and common honesty demand that appellant recover at least the reasonable value of the services otherwise rendered free to respondents under the contracts for the years for which the trial court allowed recoveries. These totals, for which appellant is entitled to recover the reasonable value, amount to $45,517.15 as against the recovery adjudged by the trial court.

Appellant, having recovered a more favorable judgment than allowed by the trial court, will recover costs of appeal.

The case is reversed to that extent, and remanded with direction to enter judgment in conformity herewith.

MAIN, MITCHELL, TOLMAN, BEALS, and BLAKE, JJ., concur.

STEINERT, J. (dissenting)—I disagree with the majority upon the fundamental theory of the prevailing opinion. The majority proceed upon the theory that, in this instance, the maintenance and operation by the appellant of its ferries was, and is, a private purpose; and that, because of the inhibitions of Art. VIII, § 7 of the state constitution, moneys raised by public taxation could not be expended therefor. If the premise were correct, the conclusion would follow. But, in my opinion, the premise is unsound.

Historically, ferries have long been considered a public necessity and are so considered in this state. According to the majority opinion, "a public ferry is a part of a highway and necessarily subserves public interest and convenience." Appellant's ferries were devoted wholly to that purpose. The interests of Pierce county and its inhabitants are vitally affected by the operation of the ferries and the facilities afforded thereby. The county and the people would probably be the very first to protest against the discontinuance of the ferries. To make the case rest wholly upon a distinction between a ferry owned and operated solely by the county and one operated by common carrier, but largely for the benefit of the county and its inhabitants, is to make a distinction without just, reasonable or practicable basis. The people are not concerned with the *method* of operation, but they are vitally concerned with the *purposes* and *results* of the operation.

For reasons best known to itself, and very prob-

ably in order to escape the expense and difficulties attendant upon its own operation of the ferries, the county perfected the arrangement under which appellant is proceeding. The method of operation was changed from one by the county to one by a common carrier, but the purposes remained exactly the same. For years, the arrangement has apparently been satisfactory to all concerned. It was only when the appellant sought to recover two recent monthly payments due it that it occurred to the county that a sum amounting to $299,000 had been paid out by it, over a period of eight years, for a totally private purpose.

What was an element of a contract is now held to be a subsidy. What was considered to be a facility for the promotion of the public interest is now regarded as a purely private utility. Upon these hard and fast technical distinctions, there is not only a complete overthrow of the very basis upon which all parties fairly and honestly proceeded, and the repudiation of a contract fully performed by one of the parties thereto, but in addition to that, a service, which in spirit and in truth has been devoted to public use, has now been placed in the category of a purely private business.

In my opinion, the appellant should recover the amount claimed by it, and the cross-complaint should be dismissed.

MILLARD, C. J., and GERAGHTY, J., concur with STEINERT, J.