[1] Reported in 108 P.2d 828.
This action was brought by the state to recover $40,417.11 from Thurston county for the care and maintenance of insane patients committed from Thurston county to the Western State Hospital for the Insane. After the action was instituted, The Washington Recorder Publishing Company intervened. The defendant county answered, denying liability, and, in the answer, it interposed five affirmative defenses, separately stated. The reply of the state denied the affirmative defenses.
The cause was tried to the court without a jury, and resulted in findings of fact from which it was concluded that the state was entitled to a judgment in the sum of $32,401.53. Judgment was entered against the county for this amount, in which judgment the action of the intervener was dismissed. From the judgment so entered, the state appealed, claiming that it was entitled to a larger judgment than the court allowed. The county appealed, claiming that it was not liable for any sum. The intervener also appealed, but made no appearance in this court.
The claim of the state was for maintenance of indigent, nonviolently insane patients committed to the hospital from Thurston county for the period from October 1, 1937, to December 31, 1939. In the case of *Page 636 State ex rel. Department of F.B. B. v. Thurston County,199 Wn. 398, 92 P.2d 234, a similar action had been brought, covering the period from January 1, 1934, to September 30, 1937, in which the liability of the county was sustained. That case will be hereinafter referred to again.
Rem. Rev. Stat., § 6930 [P.C. § 2827], contains a provision that every insane person, his estate, or relatives therein mentioned, found to have the financial ability to pay the expenses therein enumerated, shall pay therefor the sum of $4.50 per week during the time such insane person is committed to the hospital. This section contains this further provision:
"When such patient is received at the hospital for the insane to which he is committed, he shall be forthwith examined by the superintendent thereof, who shall determine whether or not such insane person is violently insane and dangerous to life and property, and shall thereupon notify the county commissioners of the county from which such person was committed, and the director of business control, of the results of such examination. If the court finds that such insane person or his estate or relatives have not the financial ability to pay said sum, and the superintendent of such hospital shall determine that such insane person is violently insane and dangerous to life and property, the charges and costs referred to in this section shall be borne by the state of Washington. If, however, the court finds that the insane person or his estate or relatives have not the financial ability to pay said charges and costs, and the superintendent of such insane hospital shall determine that such insane person is not violently insane and dangerous to life and property, such charges and costs above referred to shall be paid by the county from which the commitment is made."
It will be noted that by this statute, if the superintendent of the hospital shall determine that the insane person is violently insane and dangerous to life and property, the charges and costs referred to in this *Page 637 
section shall be borne by the state. On the other hand, if the superintendent of the hospital determines that the insane person is not violently insane and dangerous to life and property, the charges and costs referred to in the statute shall be paid by the county from which the insane person was committed.
There is no question in this case relative to the ability of the estate of the insane persons or their relatives to pay the costs as specified in the statute. The question is solely whether the state or the county shall sustain the burden, and this depends, as already indicated, upon whether insane persons are violently insane and dangerous to life and property.
[1] The first question is whether the county in this proceeding has a right to raise the question as to whether the superintendent of the hospital properly classified the patients, for the maintenance of which recovery is sought. The state says that, inasmuch as the statute makes it the duty of the superintendent to determine this question, it is a collateral attack upon the findings of the superintendent of the hospital, and, therefore, it cannot now be raised. On the other hand, the county contends that it had no opportunity prior to the time the action was instituted to raise the question as to the correctness of the superintendent's findings.
In the cases of State v. Pierce County, 132 Wn. 155,231 P. 801, 46 A.L.R. 594, and State ex rel. Department of F.B. B. v. Thurston County, 199 Wn. 398, 92 P.2d 234, it was held that, in a proceeding of this character, the county, when sued, would have an opportunity "to raise all the issues and have a full adjudication of all questions it may seek to raise."
We will now take up the other contentions of the county in the order in which they appear in its brief.
[2, 3] It contends that the evidence offered in the *Page 638 
case by the state did not sustain the findings of the superintendent. This was one of the county's affirmative defenses; and to sustain that defense, it called as a witness Dr. George E. Price, a specialist in neurology, psychiatry, and nervous and mental diseases. This witness had had no opportunity to examine any of the patients, but testified as a specialist and expressed the opinion, from the facts shown in the commitment papers and a copy of the hospital records, that certain of the patients which the superintendent had classified as not violently insane and dangerous to life and property were, in fact, violently insane and dangerous to life and property at the time of commitment.
In support of its contention, the state called as a witness Dr. William N. Keller, the superintendent of the hospital, and Dr. Robert H. Rea, one of his assistants. From the testimony of these witnesses, it appeared that, when patients were received at the hospital, they were placed under observation and treated for a period of time which might vary from ten days to six weeks, and, in some instances, a little longer. After this period of observation and treatment, the diagnosis of the patient's condition and type of insanity was made at a meeting of the hospital staff, which was attended by a number of doctors. The hospital staff consisted of fourteen different doctors, and usually about eight of them attended the staff meetings. After the staff meeting, the superintendent determines whether the patient is not violently insane or is violently insane and dangerous to life and property. Thereafter, the county commissioners of the county are notified of such determination.
The trial court found that certain of the patients which the superintendent had classified as nonviolently insane were, in fact, violently insane and dangerous to life and property; and this finding, as it recites, *Page 639 
was based upon the testimony of Dr. Price. It will be remembered that Dr. Price testified only from the records of the commitment and the records of the hospital and as to the time of commitment, he not having at any time seen any of the patients.
The county says that, inasmuch as the statute provides that, when a patient is received at the hospital, he shall be "forthwith" examined by the superintendent thereof, who shall determine whether or not such insane person is violently insane and dangerous to life and property, the procedure at the hospital did not conform to the statutory requirement. It appears from what has been said that, after a patient was received at the hospital, he was placed under observation and given treatment for a period varying from ten days to something like six weeks, and then, after a staff meeting, the superintendent made the classification.
It will be noted that the testimony of Dr. Price refers to the patient's condition at the time of his commitment, and the testimony of Drs. Keller and Rea refers to a time subsequent to that. While the statute says that the superintendent shall "forthwith" examine the patient and determine his classification, that word must be given a reasonable construction. The term has been said to be a relative one and an elastic expression. In determining its meaning in a particular case, regard must be had to the nature of the act or thing to be determined and the circumstances of the case. So far as time is concerned, there is no precise definition of the term. Its import varies with the particular case, and will imply a longer or shorter period according to the nature of the thing to be done. 25 C.J. 998;State ex rel. Lefebvre v. Clifford, 65 Wn. 313, 118 P. 40;State ex rel. Giles v. French, 102 Wn. 273, 172 P. 1156. *Page 640 
We are of the opinion that the superintendent of the hospital did not delay in making the classification of the patients for an unreasonable time. It would seem obvious that the superintendent would be in a better position at the end of that time to make a proper classification than he would if made immediately upon the patient's entry into the hospital. In view of the fact that the superintendent made the classification subsequent to the time of the commitment, and Dr. Price's testimony only went to the time of commitment and was based solely upon the record of commitment and the records of the hospital, the county has not sustained the burden of the proof to the effect that the classification made by the hospital was not the proper one.
[4] It is next contended that the superior court judgments of commitment are res judicata as against the state. With reference to this contention, it is conceded by the county that this defense was urged in the former suit (199 Wn. 398), and we are asked to reconsider the question. In that decision, it was held that the statute did not authorize the superior court
". . . at the time of the commitment or thereafter, to make a determination as to whether or not the patient was violently insane, for the purpose of determining the liability of either the state or the county, nor does the court, in fact, make any finding which would affect such right."
The county, in support of its contention that the prior decision of this court was incorrect, leans heavily on the dissenting opinion in that case. It is true that that was a five to four decision, but the majority opinion speaks the law. That opinion was well considered, comprehensive, clear, and decisive, and we are not disposed to depart from it.
[5] It is next contended that the statute unconstitutionally imposes judicial powers upon an administrative *Page 641 
officer. This question, like the preceding one, was definitely settled in the prior decision contrary to the county's contention.
[6] It is next contended that, inasmuch as, prior to the time the action was brought, the county had levied and expended the full ten mills for governmental purposes which, under the forty mill tax law, it might levy and expend for such purposes, the state should not be permitted to maintain this action. The fact that the maximum levy had been made and expended does not deprive the state of the right to recover a judgment in this case. Stateex rel. Robbins v. Scofield, 184 Wn. 270, 50 P.2d 1022;State ex rel. Hart v. Gleeson, 189 Wn. 292, 64 P.2d 1023.
[7] It is next contended that the county is not liable because it is claimed that § 6930 was repealed, either by chapter 180, Laws of 1937, p. 697, or by the public assistance act, chapter 216, Laws of 1939, p. 864 (Rem. Rev. Stat. (Sup.), § 10007-101a [P.C. § 6233-231] et seq.), in which the prior act was repealed, with the exception of one section. If there is any such repeal, it is by implication, which is not favored in the law, and it is only when the two acts are irreconcilably in conflict that the latter will impliedly repeal the former.Kruesel v. Collin, 171 Wn. 200, 17 P.2d 854; State exrel. West Side Imp. Club v. Department of Public Service,186 Wn. 378, 58 P.2d 350. The question presented by this contention is closely analogous to the contentions made in the cases of Smith v. Spokane County, 183 Wn. 477,48 P.2d 918; State ex rel. Robbins v. Scofield, 184 Wn. 270,50 P.2d 1022; and upon the authority of those cases and after giving consideration to the law of 1937 and the law of 1939, above mentioned, we hold that § 6930 was not repealed by either one of those enactments, and that it was not the intention of the legislature to do so. *Page 642 
 [8] Finally, it is contended that the state is estopped from asserting a claim against the county, for two reasons: One is that, by delay of the state in bringing the action until after the county had made all levies permitted by law and had expended the money, the state should be estopped from asserting its claim; and the other, that the court refused to admit certain testimony to the effect that certain state officers had made promises to the county that they would support remedial legislation for the benefit of the county, and that they had failed to do so.
We see no basis for the interposition of the doctrine of estoppel with reference to either one of these contentions. It may be admitted that, in certain cases, an estoppel may arise against the state, but this case does not present such a situation.
In 19 Am. Jur. 818, § 166, it is said:
"A state cannot be estopped by the unauthorized acts or representations of its officers."
It is our conclusion that the state was entitled to recover from the county for the patients in the hospital, based upon the classification made by the superintendent.
The judgment dismissing the action of the intervener will be affirmed. Upon the appeal of the state, the judgment will be reversed, and the court directed to enter a judgment as herein indicated. The judgment upon the cross-appeal of the county will be affirmed.
BLAKE, C.J., STEINERT, ROBINSON, and DRIVER, JJ., concur. *Page 643